## District of Columbia Court of Appeals Reports

SMITH v. MOORE, ET AL., 749 A.2d 132 (D.C. 2000)

Wendell SMITH, Appellant, v. Margaret MOORE, et al., Appellees.

No. 98-SP-298.

District of Columbia Court of Appeals.

Argued November 18, 1999.

Decided April 20, 2000.

Appeal from the Superior Court of the District of Columbia, Hon. Ronald P. Wertheim, Trial Judge.
Page 133

*Robert C. Hauhart*, Public Defender Service, with whom *Vincent Wilkins, Jr.*, Public Defender Service, was on the brief, for appellant.

*Mary L. Wilson*, Assistant Corporation Counsel, with whom *John M. Ferren*, Corporation Counsel at the time the brief was filed, and *Charles L. Reischel*, Deputy Corporation Counsel, were on the brief, for appellees.[fn*]

[fn*] The appellees filed a motion for summary affirmance. That motion was denied. At the request of counsel for the appellees, we treat the motion as appellees' brief.

Before TERRY and SCHWELB, *Associate Judges*, and GALLAGHER, *Senior Judge*.

Opinion for the court by *Associate Judge* SCHWELB.

Concurring opinion by *Associate Judge* TERRY at p.

Opinion by *Senior Judge* GALLAGHER, concurring in the result, at p.

SCHWELB, *Associate Judge*:

Wendell Smith appeals from the denial, without a hearing, of his petition for a writ of habeas corpus. Smith contends that the appellees, officials of the District of Columbia Department of Corrections (DOC), have unlawfully detained him in administrative segregation, that he has sufficiently alleged a denial of his liberty in violation of applicable DOC regulations, and that he is therefore entitled to an evidentiary hearing. We agree and reverse.

I.

In March 1997, Smith was a prisoner at the Occoquan, Virginia, facility operated by the DOC. Following a previous stint in "maximum security," Smith was housed in the general population.

On or about March 28, 1997, officials at Occoquan received an anonymous note from an inmate who identified himself only as "Informer." In this communication, which was addressed to Lieutenant Gregory A. King, Occoquan's Security Supervisor,
Page 134
"Informer" claimed to have overheard "Wendal Smith" telling "Ian Thorn" of Smith's alleged intention to escape from confinement with the help of an unidentified officer. Smith allegedly stated that he had uniforms ready, and that he hoped that a third inmate, "Rodney Shorter," who was "still in the Max," would come over before Smith escaped.[fn1] According to "Informer," Smith also threatened to harm a female correctional officer.

At the time Lieutenant King received "Informer's" note, there were two inmates at Occoquan named Wendell Smith. Both of them, as well as a third prisoner named Ian Thorne, were placed in "adjustment units" pending hearings before Occoquan's Housing Board, which "`determine[s] appropriate housing placement' to ensure prison safety and security." See Hatch v. District of Columbia, 337 U.S. App. D.C. 266, 268, 184 F.3d 846, 848 (1999) (quoting 28 DCMR § 522.1 (1987)). Officials strip-searched all three men and searched their cells and belongings, but found no evidence corroborating "Informer's" allegations.

On April 2, 1997, the Board convened appellant Smith's housing hearing. The DOC called no witnesses and, according to Smith, the Board relied solely on "Informer's" memorandum. Smith, who was not represented by counsel, admitted that he was acquainted with Ian Thorne and Rodney Short, but he claimed that he did not know the female correctional officer to whom "Informer" had referred in his note. Smith stated that the note was "a lie," that he was not planning to escape, and that "I think the note was dropped just to get me out of the unit." Following the hearing, the Housing Board found that

> Inmate Smith poses a definite escape risk and threat to the safety of others. Per the [DOC Regulations], the Board therefore, recommend[s] that Inmate Smith 219106 be transferred to the Maximum Security Facility on Administrative Segregation.

With the assistance of an attorney from the Public Defender Service, Smith appealed to the Warden from the Housing Board's decision. The Warden denied Smith's administrative appeal on the following grounds:

> Based on inmate Smith's previous behavior in the Occoquan Facility, and the incidents he has been involved in, the Administration of the Occoquan Facility has to take the letter submitted seriously alleging [that] inmate Smith was planning to escape and do bodily harm to correctional staff.

Smith subsequently filed a petition for a writ of habeas corpus, alleging that the appellees were unlawfully detaining him in administrative segregation. The trial judge denied the petition without a hearing.[fn2] As of October 26, 1998, the date that his appellate brief was filed, Smith had been in maximum

security[fn3] for approximately
Page 135
one and a half years.[fn4]

## II.

The procedures governing the placement of prisoners in administrative segregation are set forth in regulations promulgated by the DOC, **28 DCMR § 500**-531 (1987), in conformity with the Lorton Regulations Approval Act of 1982 (LRAA), 29 D.C. Reg. 3484 (1982). The regulation primarily relied upon by Smith provides:

> Before a resident is placed in any cell of the maximum security facility, or in a control cell of the central facility, or a control center at Youth Center II, there shall be a finding made that:
>
>   (a)  There is a clear and present threat to the safety of the resident;
>
>   (b)  The resident poses a clear and present threat to the safety of others; or
>
>   (c)  The resident poses a definite escape risk.

**28 DCMR § 521**.4. An inmate facing possible administrative segregation also has a number of procedural rights. Specifically, he is entitled to a hearing before the Housing Board, at which he has the right to counsel, § 524.3, and to written notice of the charges, §§ 523.1 et seq., 525.1. The DOC is required to present its "evidence." § 525.1. The inmate also has a limited right to call witnesses. § 525.3. The Housing Board is required to ensure that the inmate is given a hearing which "to the greatest extent possible will allow for a full and fair determination of whether the resident poses a definite escape risk or poses danger to others, or whether the health or safety of the resident is threatened." § 522.3.

The foregoing regulations were adopted in order to settle a long-pending class action by District of Columbia prisoners challenging, *inter alia*, procedures at Lorton in cases in which the DOC sought to place an inmate in administrative segregation. Their purpose was to "achieve disciplinary due process for Lorton residents," and  "[a]ll parties in the [class action] agree[d] that the subject regulations obtain[ed] that goal."  Council of the District of Columbia, Committee on the Judiciary, Report on Bill 4-351, Lorton Regulations Act of 1982, at 3 (1982) (hereinafter Judiciary Committee Report) (providing a section by section analysis of the LRAA and explaining its background and purpose).[fn5]  The Lorton regulations have the force of law, and they are binding on the District's correctional officials. *See Abdullah*, supra n. 3, 668 A.2d at 805 (citations omitted).[fn6]  We have held that a claim of the kind that Smith presents here is cognizable in *habeas corpus*. *Id.* at 808-10.
Page 136

In this case, the Housing Board found, without elaboration,[fn7] that Smith poses a "definite risk and threat to the safety of others."  Smith alleges that the Board's finding

was based solely on the anonymous note from "Informer." He asserts that Occoquan officials do not know "Informer's" identity and that there is nothing in the record from which a trier of fact could base a finding that "Informer" was reliable.

In light of the DOC regulations, Smith could lawfully be placed in administrative segregation if he represented a "clear and present" threat to the safety of others," § 521.4 (b), or if he was shown to be a "definite" escape risk. § 521.4 (c). Smith alleged in his habeas corpus petition that this standard could not be satisfied by "uncorroborated accusations from a wholly anonymous source who is nowhere shown to be identified and proven reliable in the past."

### III.

A petition for a writ of habeas corpus "should not be dismissed for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Abdullah, supra* n. 3, 668 A.2d at 804 (citations omitted). "The allegations in the petition must be taken as true and construed in the light most favorable to the petitioner." *Id*.

Section 521.4, on which Smith relies, provides that a prisoner may be placed in maximum security only if a "finding is made," presumably by the Housing Board, that there is a clear and present threat to the safety of the resident or of others, or that the resident poses a definite escape risk. In the instant case, the Housing Board made such a finding, in the sense that it recited the words of the regulation. But the LRAA and the Lorton Regulations, as we have noted, were adopted in order to achieve "disciplinary due process" for Lorton residents. *See* Judiciary Committee Report, *supra*, at 3. They were designed to implement, in disciplinary proceedings in the District's correctional facilities, at least those procedural rights of prisoners that were viewed by the courts as consistent with due process.**[fn8]** This legislative purpose would be undermined by a holding that § 521.4 may be satisfied by resort to conclusory words, without any examination by the court of the record relied upon to support the recitation.

We have no doubt that, at the time when the Lorton Regulations were promulgated, the courts would not have treated as dispositive a conclusory finding by correctional officials that the prisoner was dangerous or an escape risk. On the contrary, in cases comparable to this one, the courts examined the record of the disciplinary proceeding to determine if there was a reasonable basis for such a finding.

The applicability of the Due Process Claus to disciplinary proceedings in prisons had been discussed in some detail by the Supreme Court in *Wolff v. McDonnell*, **418 U.S. 539** (1974). The "major thrust" of *Wolff* was to prevent "arbitrary determinations." *Kyle v. Hanberry*, **677 F.2d 1386**, **1390** (11th Cir. 1982) (quoting *Gomes v. Travisano*, **510 F.2d 537**, **540** (1st Cir. 1974)). But reliance on uncorroborated allegations of an unknown informant may make a determination arbitrary, for "[n]ot all prison
Page 137

inmates who inform on other inmates are telling the truth; some are exacting their own schemes of revenge." *McCollum v. Miller*, **695 F.2d 1044**, **1049** (7th Cir. 1982); *see also Ping v. McBride*, **888 F. Supp. 917**, **923** (N.D.Ind. 1993) (quoting *McCollum*). "Requiring a reliability determination is [therefore] a procedural safeguard which helps [to] assure that the disciplinary committee conducts a full and meaningful hearing." *Wells v. Israel*, **854 F.2d 995**, **998** (7th Cir. 1988). Where, as in this case, a prisoner was subjected to severe discipline on the basis of allegations made by an anonymous informant, the informant's reliability had to be contemporaneously and independently assessed. *See, e.g., Hensley v. Wilson*, **850 F.2d 269**, **280-83** (6th Cir. 1988). In *Kyle*, *supra*, the court stated:

> [T]o make a decision based on the factual evidence presented, part of a disciplinary committee's task must be to make a *bona fide* evaluation of the credibility and reliability of that evidence. In a prison environment, where authorities must depend heavily upon informers to report violations of regulations, an inmate can seek to harm a disliked fellow inmate by accusing that inmate of wrongdoing. Since the accuser is usually protected by a veil of confidentiality that will not be pierced through confrontation and cross-examination, an accuser may easily concoct the allegations of wrongdoing. Without a bona fide evaluation of the credibility and reliability of the evidence presented, a prison committee's hearing would thus be reduced to a sham which would improperly subject an inmate accused of wrongdoing to an arbitrary determination.
>
> The procedures necessitated by the obvious dangers to an inmate are limited by a prison's peculiar needs. Specifically, because a prison needs informants in order to maintain a system of order, an institution must protect those who accuse their fellow inmates.
>
> Balancing these considerations we believe that where a committee imposes a sanction as severe as the one here, and where the committee's determination is based upon hearsay information derived from an unidentified informant, minimum due process mandates that the IDC undertake in good faith to establish the informant's reliability, at least to its own satisfaction. There must be some information on the record from which a tribunal can reasonably conclude that the IDC undertook such an inquiry and, upon such inquiry, concluded that the informant was reliable. The committee should describe the nature of its inquiry to the extent that the committee is satisfied that such disclosure would not identify an informant.

677 F.2d at 1390 (footnote omitted); *cf. Florida v. J.L.*, ___ U.S. ___, 68 U.S.L.W. 4236 (March 28, 2000) (anonymous tip to police that a person is carrying a handgun is not, without more, sufficient to permit officers to stop and frisk him); *see also Illinois v. Gates*, **462 U.S. 213**, **230** (1983); *Spinelli v. United States*, **393 U.S. 410** (1969); *Aguilar v. Texas*, **378 U.S. 108** (1964), all addressing issues concerning the reliability of an informant's tip.**[fn9]**

*Kyle, Hensley,* and the other authorities that we have cited on the subject

Page 138

of anonymous informants were decided prior to *Sandin v. Conner,* 515 U.S. 472 (1995), [fn10] in which the Supreme Court revisited and in some respects curtailed the constitutional protections available to prisoners in disciplinary proceedings. We need not and do not decide, however, whether the decisions in *Kyle, Hensley,* and like cases would be the same under a *Sandin* analysis. The Lorton regulations were promulgated long before the decision in *Sandin,* and the notions of due process that they were designed to implement were defined by *Wolff* and its progeny. We therefore conclude in light of the regulations and their history that if, at the time the LRAA was enacted, "minimal due process" would have precluded Smith's placement in administrative segregation on the basis of "Informer's" anonymous note, without more, see *Kyle, supra,* 677 F.2d at 1390, then, *a fortiori,* that note was insufficient under the LRAA and the regulations promulgated to enforce it.

In the present case, the Board apparently knew nothing about the anonymous "Informer's" identity or reliability. [fn11] Smith suspected that "Informer" bore him a grudge, and the record contains no information to the contrary. No corroboration of "Informer's" allegations has been produced. [fn12] All we know is that an unknown prisoner, who might well have had it in for Smith, made serious allegations against him.

If the facts as alleged by Smith are true, the appellees have failed to present evidence establishing either that he posed a "clear and present" threat to the safety of others or that he was a "definite" escape risk. The anonymous "Informer's" apparently uncorroborated allegations will not "to the greatest extent possible — allow a full and fair determination" of these issues, as required by § 522.3. In light of the authorities cited above, the allegations in Smith's petition, if proved to be true, are legally sufficient. "When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process." *Stewart v. Overholser,* 87 U.S. App. D.C. 402, 405, 186 F.2d 339, 342 (1950) (en banc); *accord, Abdullah, supra* n. 3, 668 A.2d at 809 (quoting *Stewart*).

Smith has undergone a lengthy ordeal as a result of "Informer's" otherwise unsubstantiated allegations against him. In our view, he was entitled to a hearing on his petition for a writ of habeas corpus.

### IV.

The appellees emphasize in their brief that "courts are ill equipped to deal with the increasingly urgent problems of prison administration," *Procunier v. Martinez,* 416 U.S. 396, 405 (1974), and that judges therefore should not second-guess the decisions of prison officials in maintaining prison security. In principle, we agree. "Presumably, the [Occoquan] officials who heard the evidence know a great deal more about running a prison than judges do." *Walton v. District of Columbia,* 670 A.2d 1346,

Page 139

1360 (D.C. 1996) (concurring opinion). But the exercise of appropriate

judicial restraint does not require, or even permit, a court to refuse to consider on its merits a prisoner's allegation that, as a result of violations by DOC officials of binding regulations, he has been denied even the modest rights retained by a sentenced prisoner under local law.

The Supreme Court, speaking through Chief Justice Burger, has recognized that "the way a society treats those who have transgressed against it is evidence of the essential character of that society." *Hudson v. Palmer*, 468 U.S. 517, 523-24 (1983). "[C]ommentators as diverse as Dostoevsky and Churchill have observed that the real measure of civilization in any society can be found in the way it treats its most unfortunate citizens — its prisoners." Craig Haney, *Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law*, 3 Psych. Pub. Pol. and L. 499 (Dec. 1997) (citations omitted). Most reasonable people would agree that locking a man in his cell for all but two or three hours a week, and maintaining this harsh regime for a year and a half or more, may inflict unwarranted suffering if unlawfully imposed. The Lorton regulations provide that a prisoner is not to be confined in these conditions unless his retention in general population poses a "clear and present" danger to others or a "definite" risk of escape. Smith has fairly alleged a protracted violation of a right protected by the regulations. We therefore reverse the decision of the trial court denying Smith a hearing on his petition, and we remand the case for further proceedings consistent with this opinion.[fn13]

*So ordered.*

[fn1] The correct names of the individuals named by "Informer" are Wendell Smith, Ian Thorne, and Rodney Short.

[fn2] The judge issued no findings of fact or conclusions of law.

[fn3] Although the present record reveals little about the conditions under which Smith was held, life as a "maximum security" prisoner in administrative segregation does not appear to be a very pleasant experience. The DOC regulations state that "[a] resident shall be provided with at least two (2) hours per week out-of-cell recreation while placed in administrative segregation; Provided, that recreation may be restricted because of extraordinary safety and security risks." 28 DCMR § 521.8.

In *Hatch, supra*, 337 U.S. App. D.C. at 268, 184 F.3d at 848, the court described another prisoner's circumstances while in administrative segregation at the DOC's Lorton facility:

> Confined to his cell twenty-three and a half hours per day on weekdays and all forty-eight hours of the weekend, Hatch had no outdoor recreation and was not allowed to work or to visit the library, gym, health clinic, psychological services, mailroom, clothing and bedding exchange, or culinary unit. He had no access to a dentist despite four written requests to have a broken, decayed tooth extracted. He had no opportunity to wash his clothes or get a haircut. Whenever he left the cell block, he was transported in handcuffs and leg

irons. Prison officials confiscated his legal papers and denied him access to legal telephone calls for ninety days.

Incredibly, Hatch was retained in administrative segregation for approximately four months after Lorton officials had found that he no longer represented a "management problem" and had recommended that he be returned to the prison's general population.

[fn4] The record does not disclose how long Smith remained in maximum security after October 26, 1998. Counsel for the DOC officials has advised us that at the time of oral argument, Smith was in maximum security at Lorton as a result of disruptive behavior after 1997. We lack any information regarding the impact, if any, of the Housing Board's April 1997 decision on Smith's present status. The appellees have not moved to supplement the record, nor have they demonstrated that the appeal is moot. In any event, the issue is capable of repetition and, as illustrated by the history of this very case, it has evaded review for a substantial period. See Tyler v. United States, 705 A.2d 270, 273 (D.C. 1997) (en banc); Teachey v. Carver, 736 A.2d 998, 1002-03 (D.C. 1999); Abdullah v. Roach, 668 A.2d 801, 804-05 (D.C. 1995).

[fn5] This court relied heavily on the Judiciary Committee Report, in Abdullah, supra n. 3, 668 A.2d at 807.

[fn6] In support of his contention that the respondents have violated the regulations, Smith has cited some authorities dealing with the constitutionality of various correctional procedures. He has not, however, asked this court to rule that the defendants have deprived him of any right protected by the Constitution.

[fn7] In this case, the DOC regulations required the Housing Board to prepare "a written statement containing the Board's decision and the factual information upon which the decision is based." 28 DCMR § 526.1. The conclusory finding that we have quoted at page [3], supra, does not satisfy this requirement, and we do not understand the appellees to claim that it does.

[fn8] The use in § 521.4 of the phrases "clear and present threat" and "definite escape risk" suggests that the drafters sought to provide protections beyond those then required by the Constitution.

[fn9] The appellees rely on the Supreme Court's statement in Hewitt v. Helms, 459 U.S. 460, 474 (1983), that "[i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards, even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents." This obviously accurate statement was made in the context of the aftermath of a prison riot, and the question was whether an inmate suspected of complicity in the riot could constitutionally be held in administrative segregation during the pendency of the investigation. No comparable issue is presented here.

[fn10] Interestingly, *Kyle* was decided on June 11, 1982, two days after the Judiciary Committee's report to the members of the Council. The LRAA became effective on September 18, 1982.

[fn11] The Board was, however, aware of the informant's claimed "basis of knowledge." "Informer" asserted that he had overheard Smith and Thorne discussing plans for escape and violence.

[fn12] We recognize that in sustaining the Housing Board's decision, the Warden relied not only on "Informer's" memorandum, but also on other information unfavorable to Smith. The record does not reveal the nature of this information. Although any relevant facts should have been included in the Housing Board's report, see **28 DCMR § 526**.1, the trial court is free to permit the respondents to produce such evidence at the hearing on Smith's petition. If that evidence, considered together with the anonymous note, supports the finding that Moore represented a definite escape risk, then the court may properly deny Smith's petition.

[fn13] If the trial judge determines on remand that the case is in fact moot, which it may well be in light of the passage of time, then he is, of course, free to dismiss Smith's petition on these grounds. If, however, the case is not moot — if, for example "Informer's" allegations remain actually or potentially relevant to the present or future conditions of Smith's confinement — then the judge may remand the case to the DOC so that the appellees may identify the facts relied upon to support the disciplinary proceeding against Smith.

    TERRY, *Associate Judge*, concurring:

    I find myself in agreement with both of my colleagues, even though they do not fully agree with each other. Judge Gallagher is entirely correct in concluding that appellant's constitutional claims are without merit. Although appellant now says he eschews any reliance on the Fifth and Eighth Amendments, his habeas corpus petition was not so unequivocal, and even his appellate brief has constitutional overtones. See footnote 5 of Judge Schwelb's opinion, *ante* at —. I therefore join Judge Gallagher in rejecting appellant's constitutionally based claims, whether explicit or implicit, for essentially the reasons he states.

    But I also join Judge Schwelb in concluding that appellant should have had a hearing in the trial court on his petition. Above and beyond the Constitution, the applicable regulations grant to prisoners additional rights which may not lawfully be infringed. As Judge Schwelb correctly observes, *ante* at —, these regulations "have the force of law, and they are binding on the District's correctional officials." *See Abdullah v. Roach*, **668 A.2d 801**, **805** (D.C. 1995). Because his habeas corpus petition alleged that his rights *under the regulations* had been violated, and because the prison authorities failed to refute those allegations in their response, the court should have held a hearing to address them. It would be premature for us to consider whether appellant is ultimately entitled to the relief he seeks, or indeed any relief at all. That remains to be seen, but at this juncture he is at least entitled to a hearing under *Abdullah* and

similar cases.

Accordingly, I join both of my colleagues in voting to reverse the denial of appellant's
Page 140
habeas corpus petition and to remand this case for further proceedings.

Gallagher, *Senior Judge*, concurring in the result:

I agree that appellant should be granted an evidentiary hearing in the trial court on his petition. The evidence adduced at that hearing would afford a basis for determining the reliability of the informant's letter.

While I agree that in this instance appellant is entitled to an evidentiary hearing so the trial court can make findings of fact, I am concerned that we not open doors that should not — as a matter of sound judgment — be opened in the prisons. Prisoners are entitled to elementary fairness but we should be hesitant to equate or come close to equating prisoners' procedural rights with the procedural rights of individuals who are not in prison. The Supreme Court has been vigilant about this.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). For example, there is no "constitutional or inherent right to parole," *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison." *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). Although prisoners are entitled to basic procedural rights, these rights must be properly balanced with restrictions appropriate to a prison population, taking into account the problems peculiar to that setting. Further, it is necessary that prison officials be given broad discretionary authority to run the prison. See *Hewitt v. Helms*, 459 U.S. 460, 467 (1983). "[T]o hold . . . that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of federal courts." *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

The Supreme Court in *Hewitt, supra*, specifically dealt with the issue of a prisoner's rights regarding placement in administrative segregation.**[fn1]** *Hewitt* made it very clear that "in determining what is due process in the prison context, one cannot automatically apply procedural rules designed for free citizens in an open society to the very different situations presented by a disciplinary proceeding in a state prison." *Hewitt*, 459 U.S. at 461. Following a prison riot in a Pennsylvania state prison, the prisoner (Helms) was removed from the general prison population and was placed in administrative segregation pending an investigation into his role in the riot. The issue presented to the court was whether the prisoner's rights under the due process clause of the Fourteenth Amendment were violated. The court held that although a prisoner has a protected liberty interest in remaining in the general prison population, the minimum due

process requirements will be satisfied as long as the inmate receives "some notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation." *Id.* at 476.

In the present case the Lorton Housing Board complied with the requirements established in the Lorton Regulations Approval Act of 1982 (LRAA)[fn2] and those regulations complied with *Hewitt*. Appellant
Page 141
was placed in administrative segregation upon discovery of the anonymous note and pending a housing hearing. Appellant received a hearing and was given an opportunity to explain his version of the story. The Board reviewed the evidence and determined that appellant posed an "escape risk" and "threat to self and others" and placed him in administrative segregation. Accordingly, it appears the steps taken by the Lorton prison officials were in conformity with the requirements established by the Supreme Court in *Hewitt*.

Appellant would be entitled to an evidentiary hearing in the trial court only for the purpose of establishing the reliability of the informant's note. The prison officials did not violate any of the requirements of *Hewitt*. Appellant's entitlement to a hearing is solely predicated on the law laid down by a number of circuits, which makes it clear that due process requires that some indicia of reliability be established before accepting confidential information as the basis for a prison disciplinary decision. *See, e.g., Hensley v. Wilson,* 850 F.2d 269, 277 (6th Cir. 1988) (holding that the record must demonstrate "at a minimum that the disciplinary committee determined for itself, on some reasoned basis, that information received from confidential informants was reliable"); *Henderson v. Carlson,* 812 F.2d 874, 879 (3d Cir. 1987) (holding that the court must be able to determine "that the disciplinary committee concluded the informant was credible or his information was reliable based on some underlying factual information"). Because the Lorton officials did not adequately test the reliability of the letter, I would agree that appellant should be given a hearing in the trial court for that purpose.

In the case at hand it does not appear in the record that there was evidence corroborating the informant's letter which alleged that appellant was planning an escape and an attack on a female prison guard. For this particular reason, appellant should be entitled to an evidentiary hearing at the trial court level. Following receipt of the informant's letter, prison officials conducted a thorough search of appellant and his cell, looking for evidence to support the informant's assertion that appellant was planning an escape from prison. No evidence of any contraband was found. So far as it appears in our record, the only basis for accepting the letter as reliable was the letter itself and a memorandum from the prison official who received the anonymous letter from another official which described the note and emphasized the need to place the prisoner in administrative segregation.

This is not sufficient to establish reliability. There is no

indication in the record that the investigating officer took an oath as to the truthfulness of the letter; there was no corroborating evidence such as other documents or statements from witnesses; and there was no indication that the prison officials had first hand knowledge of the informant's letter or a past record of reliability on the informant. *See Mendoza v. Miller*, 779 F.2d 1287, 1293 (7th Cir. 1985). So far as it appears, the Housing Board of Lorton made its decision to place appellant in administrative segregation solely based on the anonymous letter.

Accordingly, I agree the case should be remanded so that there can be a hearing in the trial court on the reliability issue. In so doing, however, I hardly agree that this case at all presents an issue going to the measure of our civilization, as the majority seems to imply. The circumstances here hardly measure a draconian analogy.

[fn1] Although the circumstances regarding the placement of the prisoner in *Hewitt* are different from the present case, the legal premise is the same. The court there established the rights afforded to a prisoner prior to placement in administrative segregation.

[fn2] 29 D.C. Reg. 3484 (1982).
Page 142

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved